**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

ELAINE L. CHAO,                    )
    Plaintiff,                     )
                                   )
     v.                           )        **Case No. 1:07cv708**
                                   )
BRANCH 4798                        )
NATIONAL ASSOCIATION OF            )
LETTER CARRIERS,                   )
    Defendant.                     )

**MEMORANDUM OPINION**

In this labor dispute, Elaine Chao, Secretary of the U.S. Department of Labor ("the

Secretary"), seeks to void an election held by Branch 4798 of the National Association of Letter

Carriers ("Branch 4798"), on the ground that the election violated certain provisions of the Labor

Management Reporting and Disclosure Act ("the LMRDA").[1]  At issue on the parties' cross-

motions for summary judgment are the following questions:

    1.     Whether a district court, on finding election violations under the LMRDA, has
          equitable discretion to decline to order a new election in certain circumstances,
          and, if not,

    2.     Whether a district court nonetheless has discretion as to the timing of a new
          election such that a court may order the Secretary to supervise a union's next
          regularly scheduled election rather than ordering an immediate new supervised
          election.

For the reasons that follow, summary judgment must be granted in part in favor of the

Secretary, insofar as a new election is ordered.  The Secretary's motion for summary judgment is

denied insofar as the Secretary requests an immediate remedial election.  Branch 4798's motion

for summary judgment is denied, although its argument on the timing of the remedial election is

_____

[1] 29 U.S.C. § 401 *et seq.*

accepted.

## I.

The material facts are essentially undisputed.  Branch 4798 is a branch labor organization representing fewer than 200 postal workers at several post offices in Fairfax County, Virginia. This Branch is part of the National Association of Letter Carriers ("NALC"), the collective bargaining representative for over 200,000 United States Postal Workers letter carriers across the country.  Pursuant to its bylaws, Branch 4798 conducts elections of officers every other December.  These elections are supervised by an Election Committee appointed by the Branch.

This dispute arises from the December 5, 2006 regularly-scheduled election ("the December election") to choose the President, Vice-President, Secretary, Sergeant-at-Arms, and three Trustees for Branch 4798.  At the time of the December election, Charles Jones had been Branch 4798 President for more than six years and was seeking reelection.  Shortly before the election, Branch 4798 member Manuel Perez distributed a flier to all Branch members, criticizing Jones and contending that Jones mismanaged Branch 4798's funds and improperly used the Branch's offices as his personal residence.  In his flier, Perez stated that Jones had refused repeated requests to vacate Branch 4798's offices.  In addition to his efforts to thwart Jones's reelection attempt, Perez ran for election as Branch 4798 Vice President.

In preparation for the December election, the Election Committee, appointed by Jones, distributed ballots at all Branch 4798 post offices.  Pursuant to Branch 4798 bylaws, December 5, 2006 was the final day on which election ballots could be received, and the Election Committee tallied the ballots on that day, as scheduled.  The results had Jones failing to win reelection by two votes.  One of the trustee slots was decided by a margin of one vote.  Yet, the Election

Committee did not release the election results on December 5, and at Jones's urging, counted

seven additional ballots that arrived after that day.  The new tally, which took place on December

8, 2006, had Jones winning by a three-point margin.  The seven additional ballots also changed

the result of one of the trustee positions.  Later that day, the Election Committee released the

results of this new tally to Branch 4798 members as the final election results.

On December 14, 2006, Manual Perez sent a letter to Branch 4798, protesting the

December election under the NALC Constitution.  He charged the Election Committee with

"election fraud" for "authorizing an unlawful recount" and failing to report the election results on

December 5, 2006.  Perez's letter also charged the Election Committee with violating Branch

4798 bylaws and the NALC Constitution, *inter alia*, by (i) failing to provide proper notice of the

election; (ii) failing to inform members that their ballots would be discounted if they did not

include identifying information on the ballot envelope, and (iii) not providing for absentee

balloting.  In total, Perez listed fourteen charges against President Jones and the Election

Committee, and sought disciplinary action against them, including expulsion from Branch 4798

membership.[2]

Branch 4798 responded to Perez by letter on February 12, 2007, denying his election

charges.  Specifically, the letter stated that Perez was "misguided and misunderstood" and had

offered "no concrete evidence of valid charges."  Perez then sought assistance from NALC,

---

[2] Gerald Seybold, former Branch 4798 Vice President, also filed charges against President Jones and alleged election violations by sending a letter directly to NALC on January 2, 2007. Seybold alleged that after he was elected Vice President in the December election, he asked Jones to resign based on Jones's improper use of Branch offices.  Jones refused and instead fired Seybold.  NALC President William Young responded that the NALC Constitution required Seybold to submit his election protest directly to Branch 4798.  It is unclear from the record whether Seybold did so or otherwise pursued his complaint.

which sent a letter to Jones on February 27, 2007, informing Jones that Branch 4798 must establish a committee to review Perez's charges before dismissing them.  The same day, NALC forwarded a copy of this letter to Perez and told him that it had advised Branch 4798 to review and process his charges properly.

On March 12, 2007, Perez wrote to NALC President William Young, reiterating his charges against Branch 4798.  He stated (i) that his complaints were not being resolved by Branch 4798, (ii) that he had "contacted the Labor department concerning these issues," and (iii) that he was planning to submit an "appeals package" to the Department of Labor ("the DOL") "as three months [had passed] and the charges are not being investigated."  After receiving this letter, NALC President Young "concluded that the issues raised are of sufficient gravity to warrant some form of intervention" by NALC, and appointed NALC Vice President Gary Mullins "to investigate all matters pertaining to the administration of Branch 4798."  Letter from William Young to Branch 4798, Mar. 20, 2007.  Pursuant to this appointment, Mullins attended Branch 4798's regularly-scheduled meeting on April 3, 2007, at which Jones conceded that many of Perez's alleged election violations were true and suggested that Branch 4798 conduct "a complete rerun of the branch election."  Letter from Gary Mullins to William Young, Apr. 16, 2007.[3]

Branch 4798 never told Perez it had decided to hold a re-run election.  Rather, it sent Perez a letter on April 16, 2007, stating that most of Perez's fourteen election charges had been

---

[3] The Secretary conceded in her motion for summary judgment that a decision to re-run the December election was made at the April 3 meeting.  Nevertheless, the Secretary correctly points out that neither the minutes of the April 3 meeting, nor Branch 4798's April 16 letter to Perez, mention the decision to hold a re-run election.

"Cleared" by the Branch.[4]  Three days later, on April 19, 2007, Mullins sent a letter to Perez

outlining the steps for "appeal[ing] the charges [Perez] brought up against Branch 4798."

Mullins also stated that he had attended the April 3 meeting, at which "[a]ll charges were read . .

. and the committee chairmen responded to each of the charges," but Mullins did not advise

Perez that Branch 4798 had decided to hold a re-run election.

As Perez had received no favorable response from either Branch 4798 or NALC

regarding his election charges, Perez protested the December election to the DOL on April 12,

2007.  The DOL began investigating Perez's claim on April 18, 2007, and received election

records from Branch 4798 one week later, on April 25, 2007.  On May 1, 2007, DOL investigator

Kenric Michel asked NALC to postpone its re-run election until the DOL could complete its

investigation.  NALC refused to do so, stating that it believed Branch 4798 was in "turmoil"

because of the flawed December election and thus could not afford to wait until the DOL

completed its investigation to hold a new election.  Declaration of Keith E. Secular, at ¶ 3.

Instead, NALC offered to allow the DOL to supervise Branch 4798's scheduled election.  The

DOL declined this invitation, as it felt it was necessary to complete the investigation of the

December election before it would be in a position to supervise any remedial election.  Thus, the

DOL continued its investigation of the December election while NALC continued to prepare for

its new election.

The DOL completed its investigation of the December election on May 18, 2007, and

---

[4] Branch 4798 contends that this letter did not constitute final action on Perez's claim, nor did it indicate that Branch 4798 had found no election violations.  Rather, the Branch contends that "cleared" meant only that the individuals against whom Perez had sought disciplinary action had been "cleared" for purposes of disciplinary action.

released its findings to NALC and Branch 4798 on May 24, 2007.  The DOL found that the

December election violated the LMRDA in several respects:

1.  Branch 4798 failed to mail ballots to members' last known addresses as required by § 401(e) of the LMRDA, 29 U.S.C. § 481(e), but instead simply distributed ballots at local post offices.  The Election Committee also failed to publish the election nomination notice and notice of election in the *Postal Record*, as required by the NALC Constitution and Branch 4798 bylaws;[5]

2.  Branch 4798 failed to insure a fair election, in violation of § 401(c) of the LMRDA, 29 U.S.C. § 481(c), when it failed to provide for absentee balloting, as required by NALC regulations;

3.  Branch 4798 failed to insure a fair election, as required by § 401(c) of the LMRDA, 29 U.S.C. § 481(c), when the Election Committee improperly counted eight ballots submitted without identifying information and improperly counted seven ballots received after December 5, 2006;

4.  Branch 4798 failed to insure a fair election, as required by § 401(c) of the LMRDA, 29 U.S.C. § 481(c), when it distributed ballots stating that members were to "Vote for Two (3)" trustee positions;[6] and

5.  Branch 4798 failed to insure a fair election, as required by § 401(c) of the LMRDA, 29 U.S.C. § 481(c), when non-Election Committee members distributed and collected ballots.

Despite receiving the DOL's report that the December election had violated the LMRDA,

NALC decided to continue with the re-run election on May 30, 2007, as scheduled.  NALC Vice

President Mullins supervised the election to ensure that election violations did not occur.[7]

---

[5] As a result of this deficient notice, only one of six retired union members cast a ballot in the election, and that retiree only obtained a ballot from his son, who currently works at a Branch 4798 post office.  The DOL also found that at least fifteen eligible Branch 4798 members did not cast a ballot.

[6] Fifty-nine ballots were distributed with the instructional error.  Seven of the returned ballots mistakenly voted for only two trustees.

[7] While the election was not investigated by the Secretary to ensure there were no violations, the record reflects that Mullins properly notified Branch 4798 members of the election

Ballots in the re-run election were tallied on May 30, 2007, with the winners announced later that day.  In the election, Seybold was elected President, and Jones, who ran for Vice President, was defeated by Perez.  With the exception of one Trustee, every officer elected in the flawed December election was defeated in the re-run election.  The new officers continue to hold office today, and no Branch 4798 members have protested the May 30, 2007 election to Branch 4798, NALC, or the DOL.[8]

Notwithstanding the election, the Secretary decided that the flawed December election could be remedied only by a new election supervised by the DOL.  Thus, the Secretary, believing that Branch 4798 would not agree to a DOL-supervised election without a court order, filed this suit on July 20, 2007.[9]  The Secretary seeks a judgment declaring void the December election and ordering Branch 4798 to hold a new election supervised by the Secretary.  Branch 4798 argues that its election remedied any flaws in the December election and that the statutory remedy is thus inappropriate.  In the alternative, Branch 4798 contends that, if a supervised election is required, an immediate new election should not be ordered, but instead that the Secretary should be allowed to supervise Branch 4798's next regularly scheduled election.  Now at issue are the parties' cross-motions for summary judgment, which have been fully briefed and argued and are ripe for disposition.

_____

and otherwise took steps to prevent the violations that had occurred during the December election.

[8] Perez, who filed the complaint giving rise to the instant action, was elected Vice President in the re-run election and has affirmed that he is "satisfied with the re-run election," which he believes was "fair and proper."  Declaration of Manuel Perez, at ¶ 3.

[9] Branch 4798 twice agreed to extend the deadline by which the Secretary must file suit under the LMRDA, ultimately agreeing that any suit must be filed by July 20, 2007.

## II.

The principles governing summary judgment are well-settled.  Summary judgment is appropriate only where "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  The non-moving party may not rest upon a "mere scintilla" of evidence to defeat summary judgment, but must set forth specific facts showing a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Where, as here, cross-motions for summary judgment are at issue, each motion is considered separately and on its merits.  *Bacon v. City of Richmond*, 475 F.3d 633, 637-38 (4th Cir. 2007).

## III.

The LMRDA was enacted to counteract the "sometimes 'shocking abuses' in the internal governance of labor organizations."  *Donovan v. Local 6, Washington Teachers' Union*, 747 F.2d 711, 713 (D.C. Cir. 1984) (citing S. Rep. No. 86-187, at 5 (1959), *as reprinted in* 1959 U.S.C.C.A.N. 2318, 2322).  Title IV's specific role in LMRDA's legislative scheme is "to insure 'free and democratic' elections" in unions.  *Wirtz v. Local 153, Glass Bottle Blowers Ass'n*, 389 U.S. 463, 470 (1968) (citing S. Rep. No. 86-187, at 20 (1959), *as reprinted in* 1959 U.S.C.C.A.N. 2318, 2336).  In furtherance of this goal, Title IV sets forth certain procedural guarantees, such as the right of all candidates to distribute campaign literature and to inspect membership lists, the right of candidates to have observers at the polls and during ballot counting, and the opportunity for members to nominate candidates and to run for office.  29 U.S.C. § 481 (c), (e); *see also Local 6*, 747 F.2d at 713-14.

Section 402(a) of the LMRDA, 29 U.S.C. § 482(a), provides that a union member who

believes a union election was flawed must first exhaust his remedies within the union.  Section 402(a) further provides that if that union member "has invoked such available remedies without obtaining a final decision within three calendar months," he "may file a complaint with the Secretary within one calendar month thereafter."  29 U.S.C. § 482(a).  Once a union member files a complaint with the Secretary, "[t]he Secretary shall investigate such complaint."  29 U.S.C. § 482(b).  If the investigation gives the Secretary probable cause to believe an election violation has occurred "and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor union" in district court.  *Id.*

This scheme, which gives a union three months to remedy a flawed election before allowing the Secretary to intervene, reflects Congress' desire to balance "revealed abuses in union elections" with "its long-standing policy against unnecessary governmental intrusion into internal union affairs."  *Glass Bottle Blowers*, 389 U.S. at 470-71 (citing S. Rep. No. 187, at 7).  Hence, while unions have "great latitude in resolving their own internal controversies," *Calhoon v. Harvey*, 379 U.S. 134, 140 (1964), the LMRDA allows the Secretary to resolve disputes where that internal union process breaks down or fails to act with appropriate dispatch.  Importantly, however, "the Secretary may attempt to settle the matter without any lawsuit; the objective is not a lawsuit but to 'aid in bringing about a settlement through discussion before resort to the courts.'"  *Glass Bottle Blowers*, 389 U.S. at 472 (quoting *Calhoon*, 379 U.S. at 140).  If the Secretary does file suit, the Secretary must show by a preponderance of the evidence that the violation of § 401 of the LMRDA, 29 U.S.C. § 481, "may have affected the outcome of an election."  29 U.S.C. § 482(c).  If the Secretary satisfies this burden, the LMRDA requires that the district court "shall declare the election . . . to be void and direct the conduct of a new

election under the supervision of the Secretary."  *Id.*

        With this statutory framework in mind, the threshold question in this case is whether

Perez, the aggrieved union member, "exhausted the remedies available under the constitution and

bylaws" of the union "without obtaining a final decision within three calendar months after their

invocation" before invoking the aid of the Secretary.  29 U.S.C. § 482(a).  Here, Branch 4798

properly concedes that Perez exhausted his internal union remedies before seeking the aid of the

Secretary; thus, the next question is whether the Secretary followed the LMRDA's procedures

before filing suit in district court.  In this regard, Branch 4798 contends that the Secretary's

action was improperly brought because the Secretary failed to make an explicit finding that the

flawed December election had not been remedied before this suit was filed,[10] and that the re-run

election effectively remedied the December election's violations.  In other words, Branch 4798

contends that the Secretary was required to consider the effect of the re-run election before

bringing suit on the December election.  This argument fails; it is directly contrary to the

Supreme Court's decision in *Glass Bottle Blowers*, holding that "the fact that the union has

already conducted another unsupervised election does not deprive the Secretary of his right to a

court order declaring the challenged election void and directing that a new election be conducted

under his supervision."  389 U.S. at 475-76.  Hence, the mere existence of an intervening

election in no way voids or moots the Secretary's suit.  *See Hodgson v. Local Union 400, Bakery

& Confectionery Workers' Int'l Union of Am., AFL-CIO*, 491 F.2d 1348, 1349 (9th Cir. 1974)

(holding that the Secretary's suit under § 402 is not mooted where "the union unilaterally

---

        [10] Significantly, however, there is no dispute that the Secretary made a finding that the
December election violations had not been remedied within three months of Perez's complaint.

conducts a second election before the Secretary files suit but after a union member has filed a proper complaint under section 402(a) of the Act").

Given that the Secretary's suit is not mooted by the re-run election, the next question under the LMRDA's statutory framework is whether a violation of § 401 of the LMRDA occurred and "may have affected the outcome" of the December election. 29 U.S.C. § 482(c)(2). This question is easily answered in the affirmative given this record and Branch 4798's concession that § 401 violations occurred in the December election[11] and that these violations "may have affected the outcome of the election." 29 U.S.C. § 482(c)(2).[12]

Given this, the next and final question is the appropriate remedy and the timing of this remedy. This question is not so easily answered. According the LMRDA, once a district court finds election violations occurred, "the court *shall* declare the election . . . to be void and direct the conduct of a new election under the supervision of the Secretary." 29 U.S.C. § 482(c) (emphasis added). Notwithstanding this seemingly mandatory statutory language, Branch 4798 contends that a court-ordered supervised election is improper in this case because the incumbents elected in the flawed December election were ousted in the re-run election, which was supervised

---

[11] Specifically, Branch 4798 concedes that it violated § 401 of the LMRDA by (i) failing properly to notify Branch 4798 members of the election, *inter alia*, by failing to mail notification to members' last known addresses and failing to publish notice in the *Postal Record*; (ii) obtaining and tallying ballots past the December 5, 2006 election date; (iii) distributing ballots with an instructional error; and (iv) counting ballots without identifying information on the outside of the ballot envelopes.

[12] Even without this concession, the existence of the violations and their nature points persuasively to the conclusion that the outcome may have been affected. In this respect, the Supreme Court has held that a violation of § 401 of the LMRDA "establish[es] a prima facie case that the violation 'may have affected' the outcome" of an election. *Wirtz v. Hotel, Motel & Club Employees Union, Local 6*, 391 U.S. 492, 507 (1968).

by a member of NALC.  The Secretary counters that the statute's language is clear and requires a

district court to order a new, supervised election despite the Branch's intervening remedial

election.

     The key question that must be answered in deciding this issue is whether a district court

has discretion under the LMRDA to refuse to order the statutory remedy of a supervised election.

The Fourth Circuit has not considered this question, and other circuits that have done so have

reached differing results.  The Secretary cites the view, espoused by the Ninth and Tenth

Circuits, that the LMRDA statutory remedy is mandatory.[13]  Branch 4798, by contrast, cites the

Seventh, Eighth, and District of Columbia Circuits, which hold that equitable principles allow a

district court, in certain narrow circumstances, to refuse to order a supervised election.[14]

     Branch 4798 chiefly argues that a district court has the discretion to refuse to order a

DOL-supervised election because a suit challenging an election under the LMRDA is a suit in

equity.  *See, e.g., Local 1010*, 664 F.2d at 149.  While Branch 4798 is correct that in some

circumstances a few courts have found that equitable principles counseled against imposing the

LMRDA's mandatory statutory remedy, most courts have done so on facts significantly

distinguishable from those presented here.  For instance, both the Seventh and the District of

---

     [13] *Usery v. District 22, United Mine Workers of Am.*, 543 F.2d 744 (10th Cir. 1976);
*Hodgson v. Local Union 400, Bakery & Confectionery Workers' Int'l Union of Am.*, 491 F.2d
1348 (9th Cir. 1974); *see also Chao v. Local 1357, Int'l Bhd. of Elec. Workers, AFL-CIO*, 184 F.
Supp. 2d 1029 (D. Haw. 2001); *Reich v. Int'l Ass'n of Machinists & Aerospace Workers Local
751-A*, No. C94-586R, 1995 WL 266353 (W.D. Wash. Mar. 1, 1995); *Hodgson v. Union de
Empleados de los Supermercados Pueblo*, 388 F. Supp. 1026 (D.P.R. 1974).

     [14] *McLaughlin v. Lodge 647, Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths
Forgers & Helpers, AFL-CIO*, 876 F.2d 648 (8th Cir. 1989); *Donovan v. Local 6, Washington
Teachers' Union, AFL-CIO*, 747 F.2d 711 (D.C. Cir. 1984); *Marshall v. Local 1010, United
Steelworkers of Am., AFL-CIO, CLC*, 664 F.2d 144 (7th Cir. 1981).

Columbia Circuits refused to order a new election because the election violations were challenged by "an incumbent union faction [which] intentionally violated the LMRDA election rules, lost the election, and then complained to the Secretary in an effort to undo the election results." *Local 1010*, 664 F.2d at 146; *Local 6*, 747 F.2d at 716.  In other words, both courts declined to order a remedial election based on a union's intentional LMRDA violation on the ground that the LMRDA was not designed to allow a wrongdoer to benefit from its wrongdoing. Thus, two of the circuits holding that equitable principles allow a district court to refuse to order a new election so held because a contrary ruling would undermine the statute's goals of ensuring fair and democratic elections.

While *Local 1010* and *Local 6* are significantly distinguishable from the case at bar, *Lodge 647*, on which Branch 4798 relies, is not.  There, the Secretary sued under the LMRDA, alleging violations in the union's 1984 election.  While the suit was pending, the union proceeded with its next regularly scheduled election.  In doing so, the union there, as here, offered the Secretary the opportunity to supervise that election, but the Secretary declined to do so.  Not willing to wait for the outcome of the suit, the union hired a former DOL administrator to provide guidance as to the new election and to ensure no election violations occurred in the process.  The Eighth Circuit first held that a district court should "make an independent evaluation of the need for the remedy proposed by the Secretary" under the LMRDA, as such discretion would (i) "prevent[] the Secretary from infringing the union's right to self-government when an intrusion is unwarranted"; (ii) "allow[] the court to fashion a remedy to fit . . . each case"; and (iii) "by recognizing a union's ability to remedy its own mistakes, . . . further[] the larger public interest in democracy."  876 F.2d at 652.  The court then reviewed the intervening

election and found (i) that the union remedied previous election violations by seeking outside assistance to review its election and voluntarily repealing bylaws which had infected the 1984 election and (ii) that no members complained about the intervening election. *Id.* at 655. On these facts, the Eighth Circuit refused to order a new election, finding that the union had remedied the 1984 election violations with the intervening regularly scheduled election. *Id.* While the Eighth Circuit's decision in *Lodge* 647 is not without its appealing aspects, there is no way to avoid the plain conclusion that the decision flies in the face of the LMRDA's unequivocal mandated remedy of a DOL-supervised election. Thus, *Lodge 647* is simply not persuasive.

Persuasive by contrast is the Ninth Circuit's *Local Union 400*, a decision that correctly reached a conclusion contrary to *Lodge 647*. There, the Secretary sued to void the union's 1970 election. After finding election violations, the Secretary suggested that the union could remedy them by either (i) holding a new election under the Secretary's supervision or (ii) holding a new election without supervision that fully complied with the LMRDA and which took place by a deadline date. The union failed to comply with either condition, but instead held a new unsupervised election seven days after the Secretary's deadline. The Ninth Circuit refused to find the union had "remedied" its election violations.[15] The court relied on the LMRDA's language and purpose to hold that a district court has no discretion to find that an intervening

---

[15] Branch 4798 seeks to distinguish *Local Union 400* on the ground that, unlike here, the results of the new election in that case were the same as those in the challenged election. Branch 4798's attempt to distinguish *Local Union 400* fails because, while the Ninth Circuit acknowledged that the results of the two elections were the same, it was equally clear that this was not the basis for the court's holding that a new election was required. Rather, the court found that the language and the purpose of the statute indicated that a district court had no discretion to decline to order a new election, regardless of the existence of an intervening election.

election has remedied past election violations.  *Id.* at 1352.  In particular, the court noted that a contrary holding could allow a union to sidestep the statutory remedy, and indeed, "a defiant union could avoid ever submitting to a supervised election by repeatedly holding unsupervised 'remedial' elections after internal remedies were exhausted on each previous election but before an action was filed."  *Id.*  Hence, the court ordered a new supervised election.

The Ninth's Circuit's view is consistent with both the language and the purpose of the LMRDA.  First, the statute makes clear that, where, as here, election violations material to the result occur, a district court "*shall* declare the election . . . to be void and direct the conduct of a new election under the supervision of the Secretary."  29 U.S.C. § 482(c).  Conspicuously absent from the statute is any language indicating that the district court may engage in an independent review of whether the election violations had been remedied before the suit was filed.[16]  Thus, the result Branch 4798 seeks is "squarely contradicted by the terms of the statute,"[17] which makes clear that a DOL-supervised election is "the exclusive statutory remedy" for violations of the LMRDA.  *Glass Bottle Blowers*, 389 U.S. at 475.

The statute also makes clear that the union has three months in which to remedy the election violations internally.  In this connection, the statute explicitly withholds jurisdiction from the Secretary during this three-month period in order to avoid "unnecessary governmental intrusion into internal union affairs."  *Id.* at 470-71 (citing S. Rep. No. 187, at 7).  But Congress

---

[16] *See generally Herman v. Local 305, Nat. Post Office Mail Handlers, LIUNA, AFL-CIO*, 214 F.3d 475, 479 (4th Cir. 2000) ("If the intent of Congress is clear, then our analysis proceeds no further, for we 'must give effect to the unambiguously expressed intent of Congress.'") (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984)).

[17] *District 22*, 543 F.2d at 750.

-15-

recognized that some unions would not take prompt steps to remedy a flawed election or would

drag its heels in doing so to the detriment of the values embodied in the LMRDA.  Thus,

Congress made the judgment that if a union fails to remedy election violations within three

months, a union no longer has "great latitude" to resolve its own affairs.  *See Calhoon*, 379 U.S.

at 140.  Instead, once a complaint is forwarded to the Secretary, the Secretary "shall investigate"

the union member's complaint to determine whether an election violation "has occurred and has

not been remedied."  29 U.S.C. § 482(b).  If the Secretary so finds, the Secretary has "sixty days

after the filing of such complaint" to bring suit.  Nothing about this language indicates that the

sixty days within which the Secretary must bring suit extends the time during which the union

may itself rectify election violations.  *Local Union 400*, 491 F.2d at 1351 (stating that the

"ordinary meaning of this language is that the determinations required by the Secretary relate to

conditions existing prior to the filing of the union member's complaint").  Instead, as the Ninth

Circuit correctly noted, "the union's opportunity to remedy its illegal actions unilaterally is cut off

by the proper filing of a complaint with the Secretary."  *Id.* at 1350 n.3.  The statute thus reflects

Congress' view that after the union fails to take advantage of its three-month opportunity to

remedy election violations internally, the Secretary's intervention is no longer an "unwarranted"

intrusion into internal union governance.

Seeking to avoid the clear import of this statutory language, Branch 4798 cites the

Supreme Court's somewhat cryptic "caution[] against a literal reading of congressional labor

legislation" in all circumstances.  *Glass Bottle Blowers*, 389 U.S. at 468 (holding that the

LMRDA's purposes supported its "unambiguous wording" that an intervening election does not

moot the Secretary's suit for a supervised election).  In this respect, Branch 4798 correctly points

out that some courts, in circumstances different from those presented here, have refused to apply

certain provisions of the LMRDA in literal or rigorous fashion.  For example, while § 402(b)

states that the Secretary "shall" bring suit in district court within sixty days of receiving a

complaint if the Secretary finds election violations have occurred, courts have allowed the

Secretary in some circumstances to extend this filing deadline.  *See, e.g., Hodgson v. Lodge 851,*

*Int'l Ass'n of Machinists*, 454 F.2d 545, 548 (7th Cir. 1971); *Hodgson v. Int'l Printing Pressmen*

*& Assistants' Union*, 440 F.2d 1113 (6th Cir. 1971).  Indeed, the Secretary in this case filed suit

beyond the sixty-day deadline, pursuant to an agreement with Branch 4798.

     Yet, it is important to note that the relaxation of a statutory procedural requirement, such

as the deadline by which the Secretary may file suit, may actually further the purposes of the

LMRDA.  As the Supreme Court noted in *Glass Bottle Blowers*, the end goal of the LMRDA is

not a lawsuit in and of itself; rather, the goal is simply to ensure fair and democratic union

elections, which may sometimes be achieved by settlement;[18] thus, an extension of the filing

deadline might allow the Secretary and the union to reach an amicable resolution of the election

violations.  By contrast, the purposes of the LMRDA would not be furthered by relaxing the

statute's mandatory remedy.  To the contrary, allowing a district court to refuse to order a new

election where a union takes remedial action *after* the three-month statutory period expires would

undermine the statute's goal of encouraging timely internal resolution of election disputes.  For if

that were the law, a union could simply refuse to process a member's election complaints, wait to

see if that member appealed to the Secretary, and only then take remedial action and perhaps

---

[18] *Glass Bottle Blowers*, 389 U.S. at 472.

even drag its feet in doing so.[19]  The LMRDA prevents this by making clear that "affording an effective remedy in the course of the union's internal grievance proceeding is the only way in which the union can be sure to avoid a court-ordered election under the Secretary's supervision," and hence "the union has a substantial incentive to respond quickly and effectively to the legitimate protests of its members."  *Local Union 400*,  491 F.2d at 1352; *see also Local 1357*, 184 F. Supp. 2d at 1038.  This incentive is an important part of the LMRDA's scheme to safeguard union democracy.

In sum, it is clear from both the language and the purpose of the statute that a district court may not refuse to order the statutorily-required remedy of a DOL-supervised election solely because a union unilaterally holds a new election after a member invokes the Secretary's jurisdiction, but before the Secretary files suit.  The statute requires a district court to impose the remedy of a supervised election; thus, summary judgment must be granted in favor of the Secretary on this point.

Yet, this does not end the analysis of this dispute, as Branch 4798 argues that, even if the LMRDA requires it to hold a new election under the Secretary's supervision, the statute's purpose would be adequately served by allowing the Secretary to supervise its next regularly scheduled election in December 2008.  The analysis of this argument must, of course, begin with the terms of the LMRDA.  And, in this respect, it is important to note that nothing in the statute

---

[19] Indeed, here, Branch 4798 decided to hold a re-run election only after Perez sent a letter to NALC, explaining that Branch 4798 had refused to process his complaints and that he had already spoken with the DOL.  Thus, while Perez did not officially file his complaint with the Secretary until after Branch 4798 decided to hold a re-run election, Branch 4798 made its decision only after (and probably because) Perez threatened to invoke the LMRDA's statutory remedy.

indicates that a district court declaring an election void under the LMRDA must direct an *immediate* new election under the supervision of the Secretary.  In other words, the LMRDA is silent on the timing of the required new election.  This silence, coupled with the fact that "proceedings brought by the Secretary under section 402 of the LMRDA are equitable proceedings,"[20] points persuasively to the conclusion that a district court has some discretion on the timing of the remedial election, a discretion that is limited, to be sure, by the LMRDA's goals and objectives.[21]

Importantly, the notion that courts have discretion in the timing of a remedial election is not novel and indeed finds firm support in thoughtful authority.  Thus, the Second Circuit has held that where the incumbents elected during a tainted election were unseated during an unchallenged intervening election, the proper remedy was for the Secretary to supervise the next regularly scheduled election.[22]  By contrast, courts have sensibly refused to wait and allow the Secretary to supervise a union's next regularly scheduled election where the incumbents who won office during the tainted election remained in power after an intervening election.[23]

Based on the circumstances of this case, the goals and purposes of the LMRDA are

---

[20] *Local 647*, 876 F.2d at 653.

[21] *Glass Bottle Blowers*, 389 U.S. at 468 (instructing that courts interpreting the LMRDA should consider "the general objectives Congress sought to achieve" in adopting the statute).

[22] *Usery v. Int'l Org. of Masters, Mates & Pilots, Int'l Mar. Div., ILA, AFL-CIO*, 538 F.2d 946, 952 (2d Cir. 1976); *see also Brock v. Local 471, Hotel, Motel & Restaurant Employees & Bartenders Union, AFL-CIO*, 706 F. Supp. 175, 183 (N.D.N.Y. 1989).

[23] *See, e.g.*, *District 22*, 543 F.2d at 751; *Chao v. Local 54, Hotel Employees & Restaurant Employees Int'l Union*, 166 F. Supp. 2d 109 (D.N.J. 2001); *Reich v. Int'l Ass'n of Machinists & Aerospace Workers Local 751-A*, No. C94-586R, 1995 WL 266353, at *4 (W.D. Wash. Mar. 1, 1995).

adequately served by ordering the Secretary to supervise Branch 4798's next regularly scheduled election in December.  First, and most importantly, Jones and all but one of the other officers elected in the flawed December election were unseated in the re-run election.  Hence, there is no risk that "the officers who achieved office as beneficiaries of violations of the Act . . . perpetuate[d] their unlawful control in the succeeding election."  *See Glass Bottle Blowers*, 389 U.S. at 474.  Second, the re-run election was supervised by Mullins, an officer of the national union who had no previous interaction with Branch 4798 or its elections.[24]  It also appears that Mullins took steps to prevent the violations that occurred in the December election from reoccurring in the re-run election, and significantly, no branch members have protested the re-run election.[25]  Finally, time considerations counsel against ordering an immediate DOL-supervised election.  Branch 4798's next regularly scheduled election is scheduled for December 2008, approximately ten months from now.  Even if an immediate new election were ordered, it is likely it would not occur much before December 2008, especially given the possibility of an appeal, which could take several months to resolve.

Thus, while the statute dictates that a new election must be held under the supervision of the Secretary, it does not mandate that such an election be held immediately.  Under the circumstances of this case, the purposes of the LMRDA are served by the Secretary supervising Branch 4798's next regularly scheduled election in December 2008.  Accordingly, summary

---

[24] *See Lodge 647*, 876 F.2d at 654 (relying in part on the union's decision to hire a former DOL administrator to oversee a re-run election in refusing to order a new election supervised by the Secretary).

[25] *Cf. Int'l Org. of Masters*, 538 F.2d 946 at 949 (holding that the proper remedy was supervision of the next regularly scheduled election where there the Secretary conceded the fairness of an intervening election).

judgment on this point must be granted in favor of Branch 4798.

An appropriate Order will issue.


_____/s/_____

Alexandria, Virginia                                    T. S. Ellis, III
January 25, 2008                                        United States District Judge